BLODGETT and others, Appellants, vs. DAVENPORT, Respondent.

*November 7—December 3, 1935.*

598

For the appellants there was a brief by *Jeffris, Mouat, Oestreich, Wood & Cunningham* of Janesville, and oral argument by *Otto A. Oestreich.*

For the respondent there was a brief by *Arnold, Johnston & Robson* of Beloit, and oral argument by *J. H. Johnston.*

FAIRCHILD, J. The acts of respondent and his predecessors might amount to gaining title by adverse possession to the strip of land in dispute within the rule set forth in *Ovig v. Morrison,* 142 Wis. 243, 125 N. W. 449, and *Krembs v. Pagel,* 210 Wis. 261, 246 N. W. 324; but for the law that land occupied adversely to a person who holds the life estate does not become the property of the one so occupying as against the remainderman during the life of the owner of the life estate. *Barrett v. Stradl,* 73 Wis. 385, 41 N. W. 439; *Hooe v. Chicago, M. & St. P. R. Co.* 98 Wis. 302, 73 N. W. 787.

A remainderman has neither actual nor constructive possession of the property. He has only an estate to vest in pos-

session *in futuro*. His right of possession does not arise until the termination of the preceding estate. While he may protect his actual interest, he is without right to maintain any action which depends on the right of possession. As the remainderman has no possession or right thereof, there can be, as to him, no invasion of such a right. Consequently, no adverse possession as to him can exist so long as he is a mere remainderman. 2 Tiffany, Real Property (2d ed.), p. 1950. This leaves for consideration only the question as to whether Sabra Fenton retained a life estate in the entire premises deeded by her to Jennie Fenton and Fred Fenton, or, as urged by respondent, only to a portion thereof.

Sabra Fenton, by warranty deed, conveyed to Jennie Fenton and Fred Fenton, in 1904, certain premises "subject to the right of the grantor to use and occupy the homestead and premises for and during the term of her natural life and to all the income derived therefrom." There was a limitation on the grant thus made to the daughter and son. They were deprived of the right of immediate possession. The particular estate not conveyed to the grantees was an estate for life. The grantor thus created a life estate. This she did not convey. The remainder is what she did convey to her son and daughter. The contention of the respondent that proper construction of the life-tenancy reservation in the various deeds eliminates any question as to the running of the statute of limitations against a remainderman, and that the life estate was only in the Fenton house and the premises immediately adjoining, cannot be sustained. The language does not indicate a purpose to exclude any portion of the premises from the operation of the reservation in the conveyance. It rather clearly indicates an intention to hold back or reserve in the grantor a life use of all the premises. She owned the entire piece. It was the entire piece that she wanted to go ultimately to her children. It was this she had in mind when she made

the conveyance to them subject to her right to use the premises "for and during the term of her natural life and to all income to be derived therefrom." The house was usually spoken of as the "Homestead." The word premises, as used in the deeds, refers to the land described in the deeds. Every phrase in the deeds that is at all assertive of reservation is the expression of a purpose on the part of the grantor not to part with her property and the control over it during her life. She reserved the premises and all the income to be derived therefrom. In the later deeds she referred to the homestead as the "Fenton House," and added a further condition calculated to prevent the children from transferring any interest conveyed to them during the grantor's life. The children's enjoyment of the premises must at all times be subject to her control. These later quitclaim deeds cannot be considered as evidencing a different intention on the part of the grantor. This was but a homemade effort on the part of the grantor, for reasons sufficiently appearing on the surface of events, to divide the remaindermen's estate, and at the same time to retain her life estate in the premises. When the first deed was executed, there was one group of buildings on the entire premises. This was a house, used as a home for the family, and the usual outbuildings. When the daughter married, she and her husband built a home of considerable value on the north half of the premises. The first deed conveyed to the children the whole of the premises as tenants in common. After the daughter's marriage and the building of the new house, the mother considered it advisable to arrange an exact division between the children of the estates which were to go into effect after her death. This was to insure the daughter's investment in the part of the property on which she had built her home. To accomplish this, Sabra Fenton and Jennie Hendley joined in a quitclaim deed to Fred Fenton whereby he was granted the south half of the

premises on which the "homestead" stood, and Fred Fenton and Sabra Fenton executed a quitclaim deed to Jennie Hendley of the north half on which the daughter's house stood. The two deeds were identical in all respects except as to the description of the property, and both contained the following reservation:

"This conveyance is made subject to the life estate or right of the grantor, . . . to use and occupy the homestead, the Fenton House, and premises during the term of her natural life and all income to be derived therefrom; and it is one of the conditions of this conveyance that the same shall not be sold or alienated by the grantee without the consent and joinder of the grantor. . . ."

This clause is the same as that included in the first deed with the exception of the use of the words "the Fenton House," and the inclusion of a provision against alienation. The scheme of giving the property one half to her son and one half to her daughter after her death is apparent. The instruments by which this was sought to be accomplished made the grantees remaindermen. The rights of the successors of Jennie Fenton and Fred Fenton must now be determined on that basis. The claimed possession of the triangular strip of land by respondent and his predecessors could not operate as adverse possession against the interests of Fred Fenton until after the death of his mother in 1928. The respondent's claim of title by adverse possession is therefore without foundation.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for plaintiffs.